Randall M. Fox
Anthony E. Maneiro
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY  10022
Phone: (212) 371-6600
Fax: (212) 751-2540

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMSTERDAM TOBACCO CO., INC., DONOHUE CANDY AND TOBACCO CO., INC., KINGSTON CANDY & TOBACCO CO., INC., MOUNTAIN CANDY & CIGAR CO., INC., and SUNRISE CANDY & TOBACCO CORP., <br><br> Plaintiffs, <br><br> -against- <br><br> HAROLD LEVINSON ASSOCIATES, LLC, CORE-MARK MIDCONTINENT, INC., MCLANE/EASTERN, INC., MCLANE/MIDWEST, INC., PLAINFIELD TOBACCO AND CANDY CO., INC. D/B/A RESNICK DISTRIBUTORS, and CONSUMER PRODUCT DISTRIBUTORS, INC. D/B/A J. POLEP DISTRIBUTION SERVICES, <br><br> Defendants. | **Case No.: 1:18-cv-01432-KAM-VMS** <br><br> **AMENDED COMPLAINT AGAINST CORE-MARK MIDCONTINENT, INC.** <br><br> **Jury Trial Demanded** |

## INTRODUCTION

1.      Plaintiffs Amsterdam Tobacco Co., Inc. ("Amsterdam Tobacco"), Donohue

Candy and Tobacco Co., Inc. ("Donohue Candy"), and Mountain Candy & Cigar Co., Inc.

("Mountain Candy," collectively, "Plaintiffs"), by their attorneys, file this Complaint against

Defendant Core-Mark Midcontinent, Inc. ("Core-Mark") for injunctive relief and to recover damages and costs under the New York Cigarette Marketing Standards Act, N.Y. Tax Law Art. 20-A (the "CMSA").

2.     This case concerns Core-Mark's systematic violations of the CMSA by giving illegal prices with the intent and effect of harming Plaintiffs and harming competition more generally. Because Plaintiffs followed the CMSA's rules on minimum cigarette prices, they could not compete with Core-Mark's illegal prices that were below the CMSA's minimums and thus their businesses were severely damaged.

3.     The CMSA was enacted in 1985 with the express legislative intent to stabilize the cigarette industry in New York State and to enable cigarette agents and dealers to compete fairly for cigarette sales. It sets minimum prices at which cigarette distributors can sell cigarettes in the state. A distributor violates the CMSA when it sells cigarettes for less than those minimums with the intent to harm competitors or destroy or substantially lessen competition. The CMSA is often referred to as New York's minimum price law or its fair trade law.

4.     Defendant Core-Mark is one of the largest cigarette wholesalers operating in New York State. Beginning before 2015 and continuing through to the present day, Core-Mark has repeatedly violated the CMSA by charging illegal prices below the legal minimums with the intent of injuring Plaintiffs by taking business from them. Core-Mark carefully disguised its illegal prices, often by concealing rebates within "allowance" payments or by falsely called its rebates "credits" for such things as nonexistent returned or damaged goods.

5.     The Plaintiffs are all smaller licensed cigarette distributors based in New York. All are family-operated businesses that have been in operation for decades. Amsterdam Tobacco has been passed down within the same family for nearly a century. Unlike Core-Mark, Plaintiffs

do not charge illegal cigarette prices, and Core-Mark has taken advantage of Plaintiffs'

compliance with the law to steal away their established and prospective business with its illegal

prices and to keep that business for itself.

6.      Plaintiffs are competitors of Core-Mark and have been injured in various ways by

Core-Mark's violations of the cigarette minimum price law.  Each of the Plaintiffs has, for

example, lost customers and business when customers switched some or all of their purchases to

Core-Mark to take advantage of Core-Mark's illegal cigarette prices.  Plaintiffs have also had the

values of their businesses reduced because of Core-Mark's illegal actions.

7.      The CMSA specifically empowers persons who have been injured by CMSA

violations to bring suit against the violators of the Act and to recover the damages they have

suffered, along with costs including attorneys' fees.

8.      Plaintiffs bring this suit to recover the damages they have suffered as a result of

Core-Mark's violations of the CMSA and to obtain an injunction preventing Core-Mark from

continuing to violate the law.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Core-Mark because it can be found,

resides, and/or transacts business in New York State.

10.     Defendant has consented to venue in this Court.

## PARTIES

11.     Plaintiff **Amsterdam Tobacco Co, Inc.** ("Amsterdam Tobacco") is a New York

corporation incorporated in 1924.  It has its principal place of business at 1614 Amsterdam

Avenue, New York, New York.  Amsterdam Tobacco is licensed by the State of New York as a

cigarette wholesale dealer and was, until recently, licensed as a stamping agent.

12.     Plaintiff **Donohue Candy and Tobacco Co., Inc.** ("Donohue Candy") is a New York corporation incorporated in 1974.  It has its principal place of business at 182 Maple Street, Glens Falls, New York.  Donohue Candy is licensed by the State of New York as a cigarette stamping agent and wholesaler.

13.     Plaintiff **Mountain Candy & Cigar Co., Inc.** ("Mountain Candy") is a New York corporation incorporated in 1968.  It has its principal place of business at 40 Lake Street, South Fallsburg, New York.  Mountain Candy is licensed by the State of New York as a cigarette stamping agent and wholesaler.

14.     Defendant **Core-Mark Midcontinent, Inc.** ("Core-Mark") is an Arkansas corporation with a business location at 160 Enterprise Road, Johnstown, New York.  Core-Mark Midcontinent is a wholly owned subsidiary of Core-Mark Holding, Inc., a publicly traded company.  It conducts the business of Core-Mark Holding, Inc. in New York State and other states.

15.     Core-Mark Midcontinent is and has at all times relevant to this case been an out-of-state cigarette distributor that has been licensed as a cigarette agent and a cigarette wholesaler by both the State Tax Department and the City Tax Department.  It has distributed cigarettes throughout New York State, including in this county.

## FACTUAL ALLEGATIONS

## I.     THE CIGARETTE CHAIN OF DISTRIBUTION

16.     The distribution of cigarettes in New York State is subject to laws and regulations that determine who can sell cigarettes and, under the CMSA, the minimum prices at which they can sell cigarettes.

17.     The primary levels of distribution include the following:

            a.   cigarette manufacturers, who produce the cigarettes;

4

    b.  cigarette stamping agents, who purchase cigarettes from the manufacturers and purchase tax stamps from the government that they then affix to the packs of cigarettes, and who then sell the stamped cigarettes, mostly to wholesalers or retailers;

    c.  non-stamping wholesalers, sometimes called subjobbers, who purchase stamped cigarettes from stamping agents and sell them mostly to retailers; and

    d.  retailers, who sell the cigarettes to consumers.

18.    The agents, wholesalers, and retailers must all be licensed by the State Tax Department in order to sell cigarettes in New York State.  Similarly, to sell cigarettes in New York City, cigarette agents and wholesalers must be licensed by the City Tax Department.

19.    Plaintiffs are or have been licensed by the State Tax Department as agents or wholesalers.  Plaintiffs Amsterdam Tobacco and Mountain Candy have also been licensed by the City Tax Department.

20.    Core-Mark is and has been at all times relevant to this case licensed in New York State and New York City as a cigarette agent and wholesaler.  As part of Core-Mark's business in New York, it purchases cigarettes from manufacturers, purchases tax stamps from the State Tax Department, affixes the tax stamps to cigarette packages, and sells cigarettes to retailers and to other customers, such as smaller wholesalers.

## II.    THE CIGARETTE MARKETING STANDARDS ACT

### A.    The Legislative Purpose and Intent of the CMSA

21.    In 1985, the New York State Legislature enacted the Cigarette Marketing Standards Act after finding that cigarette distributors in New York, and the jobs they created, were threatened by distributors from neighboring states that already had minimum cigarette price

laws.  Because the nonresident distributors were making a reasonable and steady profit on

cigarette sales in their home states, they could disrupt competition by using that steady profit

from their home states to offer "low-ball" prices in New York with which resident distributors

could not compete.  New York thus enacted its own cigarette minimum pricing law—the

CMSA—to put New York distributorships on an equal footing with their out-of-state

competitors.

      22.     The sponsors of the CMSA, Senator Marchi and Assemblyman Kremer, described

the purpose of the CMSA in their memorandum in support of law, as follows:

> This means that nonresident distributors who are authorized to do business
> in New York are making a reasonable and steady profit on cigarette sales
> in their home states.  This profit base provides nonresidents with the
> ability to "low-ball" prices in New York.  When New York distributors
> must match these low prices in order to compete with nonresident
> distributors, their profit level becomes unacceptable or disappears.
>
> As a result of this difference between New York and New Jersey, New
> York is threatened with the loss of cigarette distributorships, along with
> jobs, to New Jersey.  The largest distributor in New York, for example, is
> on record as evaluating such a move which would cost New York 200 jobs
> within the next several months.  Industry sources have advised that as
> many as 2,000 jobs are at stake over the near future.
>
> This legislation will place the distressed tobacco industry in New York
> State on an equal footing with its out-of-State competitors.

12590 Legislative Bill and Veto Jacket 1985 at 6 (sponsor memorandum).

      23.     In passing the CMSA, the Legislature relied upon a report prepared by the State

Tax Department's Cigarette Predatory Pricing Task Force, which concluded that while there was

no definitive evidence of predatory pricing, there was "clear evidence of substantial economic

dislocation in the cigarette industry in New York State.  Available records show clearly a level of

profits depressed below historical levels in New York State.  Profit levels are also substantially

lower than those in neighboring states."  New York State Department of Taxation & Finance,

Cigarette Pricing Task Force Report, April 1985, at 20.  The Task Force described the situation

faced by New York distributors without the law:

> When New York dealers began losing accounts to New Jersey distributors,
> they started to fight back by matching New Jersey dealers' prices.  What
> has been described as a "grinding process" occurred over a period of
> several months whereby the wholesale price of cigarettes was gradually
> reduced to a matter of cents above cost per carton.

*Id*. at 15.

24.     The State Tax Department supported the 1985 legislation because the pre-

legislation market left profit margins "unacceptably low" for New York businesses:

> The Department of Taxation and Finance's Cigarette Predatory Pricing
> Task Force concluded, in a report dated April, 1985, that despite the
> absence of definitive data on the existence of predatory pricing by out-of-
> state distributors, there is clear evidence of substantial economic
> dislocation in the cigarette industry in New York State.  Much of that
> dislocation appears to stem from the fact that New York is surrounded by
> states which have cigarette minimum price laws.  Of the five states
> bordering New York, only Vermont does not have an unfair cigarette sales
> statute requiring minimum markups.  Because of such laws, nonresident
> distributors who are authorized to do business in New York are making a
> reasonable and steady profit on cigarette sales in their home states.  This
> profit base provides the nonresident distributors with the ability to sell
> cigarettes in New York at prices below the market price.  When New York
> distributors match those lower prices to avoid losing customers, their
> profit margins become unacceptably low.
>
> . . .
>
> . . .  If this legislation is approved, the State Tax Commission will use its
> power to adopt rules and regulations to implement the provisions of
> Article 20-A in a fair and equitable manner, with the intention of enabling
> all elements of the cigarette distribution industry to make reasonable
> profits from their labors and to ensure that no segment of the industry is
> injured in order to benefit other dealers. . . .

12590 Legislative Bill and Veto Jacket 1985 at 18-19 (Tax Commissioner's letter to the

Governor).

25.     The CMSA passed despite the State Attorney General's concerns that it ran counter to interests of promoting competition.  The Attorney General recognized that, under the law, distributors "are, in effect, given insulation from both out-of-state and in-state price competition."  He further recognized that "free and open market competition may be significantly impaired."  *Id.* at 21 (Attorney General Abrams' memorandum for the Governor).

**B.     The CMSA's Prohibition of Sales Below Statutory Minimum Prices**

26.     The CMSA makes it unlawful for a cigarette agent, with the intent to injure competitors or to destroy or substantially lessen competition, to sell cigarettes for less than the minimum prices set in the statute.  Accordingly, a violation has two elements: (i) sales below the minimum price, and (ii) the required intent.

**C.     The CMSA Formula for Determining Minimum Prices**

27.     For every stamping agent in New York, the minimum prices are set by a formula in the statute.  For a stamping agent, the formula provides for a minimum price that is (i) the price charged by the manufacturer for the cigarettes, plus (ii) the cost of the tax stamps, plus (iii) a mark-up amount set forth in the statute.

28.     The first component of the statutory formula, the price charged by the manufacturer, is set by the manufacturer.  The manufacturer's price is the "invoice cost of cigarettes to the agent who purchases from the manufacturer, or the replacement cost of cigarettes to the agent, in the quantity last purchased, whichever is lower, less all trade discounts, except discounts for cash."  N.Y. Tax Law § 483(a)(1).  The "invoice cost" is "the list price of cigarettes to the agent from the manufacturer prior to any trade discounts including discounts for cash;" the "replacement cost" is "the current list price to the agent from the manufacturer to replace such cigarettes, in the quantity last purchased, prior to any trade discounts including discounts for cash."  20 N.Y.C.R.R. 80.2(a)(2)(i).  "Trade discount" means "the difference

8

between a manufacturer's list price and the price at which the manufacturer actually sells cigarettes.  A trade discount is a discount given by the manufacturer of cigarettes to the agent at the time of sale and shall be separately stated as such on the invoice or other document of sale. Trade discount does not include a rebate."  20 N.Y.C.R.R. § 80.2(a)(2)(iii).

29.     The cigarette manufacturers charge the same prices to all stamping agents in New York State, whether based on invoice costs or replacement costs, and after all trade discounts.

30.     The second component of the statutory formula, the cost of the tax stamps, is set by New York State law and, for cigarettes sold in New York City, by New York City law.

31.     The third component of the statutory formula, the mark-up amount, is set by the CMSA, which provides for different mark-up amounts depending upon the type of customer to whom the stamping agent sells cigarettes.

32.     Where a stamping agent sells to a retail dealer (non-chain store), the mark-up amount is three and seven eighths percent of the "agent's basic cost" (the "agent's basic cost is the sum of the first two components of the formula) plus two cents per 20-cigarette pack of cigarettes.

33.     The State Tax Department periodically issues a publication that calculates minimum cigarette prices following the CMSA formula.  The State Tax Department's Publication 509 issued in October 2017, for example, showed that where the cigarette manufacturer's list price for a carton of cigarettes (20 cigarettes per pack, 10 packs per carton) was $41.64, the minimum price at which the stamping agent could sell to a retail (non-chain) dealer in New York City was $104.23.  This $104.23 was the sum of the $41.64 manufacturer's price, $58.50 for the tax stamps, and a $4.09 markup.

34.     The State Tax Department's publication shows this information about the carton with a manufacturer's list price of $41.64 as follows:

| New York City (sales within New York City) | | Minimum sales prices for standard brands* | | | | |
|---|---|---|---|---|---|---|
| Manufacturer's list price ** (per carton) | Agent's basic cost (per carton) | Type of sale | | | | |
| | | Wholesale (per carton) | | | Retail sales to the consumer | |
| | | Agent to wholesale dealers | Agent to chain stores | Agent to retail dealers | Retail (per carton) | Retail (per pack) |
| $41.64 | $100.14 | $101.22 | $101.85 | $104.23 | $111.52 | $11.16 |

35.     A stamping agent must use the CMSA formula to determine the minimum price unless it has specifically filed with the State Tax Department proof satisfactory to the Department that its costs are lower than the formula cost.  As the sponsoring legislators described it in 1985, the percentages set out in the CMSA formula "are presumed to be their [the distributors'] costs of doing business.  The Tax Commission will have the power, upon application, to approve alternative markups for wholesalers and retailers furnishing satisfactory proof of lower costs."  12590 Legislative bill and Veto Jacket 1985 at 14 (sponsor memorandum).

36.     The Legislature provided for ease in discovering whether any stamping agent or other distributor had received approval from the State Tax Department to use its actual costs, rather than the CMSA formula, to determine its minimum cigarette prices.  Unlike much else in the Tax Law, the Legislature provided that tax secrecy does *not* apply to the fact that a distributor has calculated a lower cost, nor to the amount of that lower cost, which means they can be disclosed either through requests under the Freedom of Information Law or otherwise.

37.     To date, no stamping agents has submitted sufficient proof of costs lower than the CMSA formula costs.  Accordingly, all stamping agents, including Core-Mark, must use the CMSA formula to determine the minimum prices.

38.     The Legislature also made sure that a distributor could not avoid the minimum price rule by bundling its sales of cigarettes with the sale of other products and selling them for a

combined price.  It provided in the CMSA that the distributor cannot make such combined sales

for prices below combined costs.  N.Y. Tax Law § 485(b).  As stated in the Tax Department's

regulation on this subject, where the agent's sale of cigarettes with other products for a combined

price, the combined price cannot be "below the cost of the agent …, plus the cost of all of the

articles, products, commodities, gifts and concessions included in such transactions."  22

N.Y.C.R.R. § 86.3.

### D.  The CMSA Makes Giving Rebates Inherently Suspect

39.     Where a stamping agent gives a rebate or other price concession to a customer,

the rebate or price concession is counted as lowering the price, directly or indirectly, of the

cigarettes and can push the price below the CMSA minimum.  The stamping agent has the

burden of proving that its prices after rebates or other concessions are *not* below the CMSA

minimum.  According to the regulations of the State Tax Department:

> A rebate or a concession, in and of itself, is neither unlawful for the
> purpose of the cigarette marketing standards nor a violation of the Tax
> Law where such rebate or concession does not directly or indirectly serve
> to reduce the price below that at which cigarettes can be lawfully sold or
> purchased in this State.  A determination as to whether a rebate or
> concession has been offered, given, induced or procured and as to whether
> or not such rebate or concession reduces the price of cigarettes below the
> legal minimum, demands a close analysis of each situation on its own
> merits.  *The burden of proving the legality of a rebate or concession shall
> be upon the seller when such rebate or concession is offered or given*, and
> upon the purchaser when the rebate or concession is induced or procured.

20 N.Y.C.R.R. § 84.1(b)(2) (emphasis added).

40.     The giving of rebates or the sale of cigarettes below the minimum price also gives

rise to a presumption of a stamping agent's intent to injure competitors or to destroy or

substantially lessen competition.  The stamping agent then has the burden of proving that it did

not have that intent.  Specifically, New York Tax Law § 484(a)(6) states:

> *Evidence of* advertisement, offering to sell or *sale of cigarettes by any agent*, wholesale dealer, chain store or retail dealer *at less than cost, or evidence of* any offer of a rebate in price, or *giving of a rebate in price*, or an offer of a concession, or the giving of a concession of any kind or nature whatsoever in connection with the sale of cigarettes, or the inducing or attempt to induce or to the procuring or the attempt to procure the purchase of cigarettes at a price less than cost of the agent, wholesale dealer, chain store or the retail dealer, *shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition*, or of intent to avoid the collection or paying over of such taxes as may be required by law.

New York Tax Law § 484(a)(6) (emphasis added).

### E.  Exceptions to the Minimum Price Rule

41.  One narrow exception to the minimum price rule in the CMSA is that a cigarette stamping agent can sell cigarettes to a particular customer for less than the statutory minimum price where it can establish, with proof, that a competitor was selling cigarettes to that customer for a price lower than the statutory minimum, and the stamping agent acts in good faith to meet, but not beat, the price of that competitor.  Such good faith requires that the stamping agent diligently investigate for each transaction whether a competitor is, in fact charging a price below the statutory minimum and whether that low price is legal.  It is not enough for the stamping agent to simply take the customer's or prospective customer's word about a lower price, since the customer has a financial interest in bargaining down the stamping agent's price.

42.  This "meeting competition" exception in the CMSA could apply if a stamping agent's competitor had successfully taken advantage of the option to establish to the State Tax Department that its actual costs rather than the costs presumed by the CMSA formula (described above).  The competitor could, in that instance, have a legal price lower than the minimum calculated under the formula.  Under the exception, the stamping agent would have the opportunity to meet that competitor's price in specific transactions.

43.     Because no stamping agents operating in New York have taken advantage of the option to use its actual costs rather than the costs presumed by the CMSA formula, there have been no competitors in New York who could legally charge a price below the statutory minimum.

44.     Any stamping agent who exercised due diligence about a customer's or prospective customer's claim that a competitor was offering that customer a price below the statutory minimum, would have discovered the purported price of the competitor could not have been a legal price and thus that the "meeting competition" exception did not apply.  Accordingly, it could not carry its burden of proving that it was offering prices below the minimum in good faith to meet the price of a competitor.

     **F.     The CMSA's Private Right of Action**

45.     A person injured by violations or threatened violations of the CMSA is entitled to institute a lawsuit to enjoin violations of the CMSA and recover damages, as well as the costs of suit including reasonable attorneys' fees.

**III.     CORE-MARK VIOLATED THE CMSA**

46.     Since before 2015 and continuing until the present time, Core-Mark has engaged in a broad scheme to give rebates to its customers in New York, driving its cigarette prices below the legal minimums with the intent to injure Plaintiffs and other competitors and to destroy or substantially lessen competition.

47.     Core-Mark has list prices for the cartons of cigarettes it sells to customers in New York that are almost always at the CMSA per-carton minimum price.  In the few instances when it diverged from those prices, its list prices were at pennies above the CMSA minimum prices.

48.     By giving any cigarette rebates, or rebates of more than a few pennies, to its customers, Core-Mark lowered its cigarette prices below the CMSA per-carton minimum prices.

49.     Core-Mark extended rebates to its customers in New York as a regular part of its doing business, and it extended the rebates in various forms.  It has often given rebates of certain dollar amounts, such as $2 or $3 per carton of cigarettes purchased by the customer.  At other times, Core-Mark built the rebates into up-front or periodic payments provided for in contracts with its customers.

**A.     Core-Mark's Sales Manager Admits to Core-Mark's Illegal Pricing**

50.     Core-Mark interacts with its customers in New York, in part, through sales agents who call on the customers.  Among other things, these sales agents are responsible for gaining new customers and servicing existing customers.  As part of their responsibilities, the sales agents discuss and agree with customers on the rebates and other price concessions that Core-Mark offers.

51.     Core-Mark's sales agents are also responsible for conveying to Core-Mark's headquarters information about the terms of sale agreed to with customers so that the customers can be consistently billed and credited using the agreed terms.

52.     According to a senior Core-Mark sales manager, Core-Mark gives rebates of up to $3 per carton to a retailer in New York that is buying 100 cartons of cigarettes a week, but the exact amount depends on the volume of purchases.  As he said, "It's with each particular customer and how much business they're going to give to us."  By referring to rebates of up to $3 per carton, the sales manager was referring to Core-Mark's giving $3 back to the customer for each carton of cigarettes, which thus reduces the customers cost for the carton, and reduces it well below the list price.  Because the list price is at the CMSA minimum level or exceeds that minimum by pennies, the $3 rebates necessarily pushes the price below the statutory minimum.

53.     Core-Mark's sales manager confirmed that Core-Mark presents its rebates on monthly billing statements as "credits," including, for example, credits for "returns."  Core-Mark often pays these amounts by check.

54.     Core-Mark is also well aware of the CMSA and that the rebates it gives violate the minimum price requirement.  When its sales manager was asked what a retailer should say to auditors if asked about the cigarette rebates, the sales manager instructed that the retailer should lie and say the credits were for merchandise returned or whatever it says on the billing statements.

55.     Core-Mark's sales manager admitted that he knew that competitors' rebates were not legal.  When he was asked if what competitors were doing with cigarette pricing was "legit," he responded "no."

**B.     Core-Mark's Illegal Prices Based on Rebates of Dollars Per Carton**

56.     One way in which Core-Mark illegally priced its cigarettes was by offering secret rebates to its customers of some number of dollars per carton, where those rebates pushed its prices below the statutory minimum price.

57.     Because Core-Mark's list prices for cigarettes were at, or pennies above, the statutory minimums, its rebates of dollars per carton necessarily pushed its prices below the statutory minimums.

58.     When signing up new customers for these dollars-per-carton rebates, Core-Mark had its sales representatives use special codes on its customer forms that would be misleading to anyone outside the transaction.  The amounts of per-carton rebates for branded, generic, and sub-generic cigarettes were recorded on these forms as if they were amounts related to completely different products.  The data from these forms was then added to Core-Mark's customer and

financial electronic systems so that the customers could receive the rebates, and the illegal pricing, as agreed.

59.    Core-Mark has the most complete records of the many instances in which it gained and kept business by offering prices below the CMSA minimum prices to customers in New York, and such records include documents regarding the customers it solicited, the pricing it offered and charged, the manners in which it disguised its rebates, and the amount of business it gained.

60.    Even though Core-Mark has the most detailed information about the business it gained by charging cigarette prices below the CMSA minimum prices, Plaintiffs have learned about instances of Core-Mark's misconduct that illustrate Core-Mark's broader violations. Accordingly, Plaintiffs illustrate Core-Mark's illegal pricing through the use of dollars per carton rebates with several examples, set forth below.

### 1.    Illustrative Example:  Tri-State Candy Wholesale, Inc.

61.    Starting in 2001 and continuing for more than a decade, Plaintiff Amsterdam Tobacco was the exclusive or near-exclusive cigarette supplier for subjobber Tri-State Candy Wholesale, Inc. in Maspeth, Queens, New York ("Tri-State") for cigarettes stamped for sale in New York City.  A subjobber is a cigarette wholesaler that does not have a stamping license. Amsterdam Tobacco also sold some non-cigarette products to Tri-State.

62.    Tri-State's owner consistently expressed his appreciation that Amsterdam Tobacco was the only supplier who would deliver early in the day and would deliver every day. He also complained that the rebating by other agents was hurting his subjobber business and that he needed to find suppliers who would give him rebates so he could stay in business.

63.     Amsterdam Tobacco charged its cigarette list prices to Tri-State, and those list prices were exactly at the minimum price calculated under the CMSA formula.  Amsterdam Tobacco's list prices were the same as Core-Mark's list prices.

64.     In or about 2012 and continuing over the next several years, Amsterdam Tobacco noticed that Tri-State had reduced its purchases of major brand cigarettes from Amsterdam Tobacco.  Upon inquiry, Amsterdam Tobacco discovered that Tri-State was shifting its business to Core-Mark because Core-Mark was giving it rebates of $1 per carton.

65.     The owner of Tri-State informed Amsterdam Tobacco over the years, including in 2015 and 2016, that Tri-State would move all of its New York City business back to Amsterdam Tobacco if only Amsterdam Tobacco would give rebates.  Amsterdam Tobacco, knowing that the Core-Mark rebates were illegal, refused to give rebates.  The owner of Tri-State also complained that Core-Mark did not give the same type of reliable service as Amsterdam Tobacco.

66.     Over the course of 2014 to 2017, Amsterdam Tobacco lost significant sales to Tri-State because it would not extend the illegal prices that Core-Mark extended.  In 2014, Amsterdam Tobacco was selling over $13.5 million in cigarettes, and over $13.7 million in all goods, to Tri-State.  Because of Core-Mark's illegal prices, by 2017, Amsterdam Tobacco lost a substantial part of those sales, selling about $5.9 million in cigarettes, and about $6 million in all goods, to Tri-State.

67.     At the time of each of Core-Mark's transactions with Tri-State, no other competitor had offered Tri-State legal prices that were equal to or lower than the prices at which Core-Mark sold cigarettes to Tri-State.

68.     At the time of each of Core-Mark's transactions with Tri-State, Core-Mark did not make good faith efforts to determine whether any competitors were charging Tri-State legal prices below the statutory minimum for the same goods, nor did it make good faith efforts to meet, but not beat, such prices.  To the contrary, Core-Mark recognized that other companies' prices were not "legit."

69.     Core-Mark offered its rebates to Tri-State with the intent to harm competitors such as Amsterdam Tobacco, and to destroy or substantially lessen competition.

**2.     Illustrative Example:  Holbrook Development Corp.**

70.     Holbrook Development Corp. owns a group of about 25 retail stores.  Before about September 2016, Plaintiff Mountain Candy was the primary cigarette supplier to one of its stores in Holbrook, Long Island, New York ("Holbrook").  About 88 percent of Mountain Candy's sales to the Holbrook store were cigarettes, and the remainder was non-cigarette goods.

71.     Mountain Candy charged its cigarette list prices to the Holbrook store, and those list prices were exactly at the minimum price calculated under the CMSA formula.  Mountain Candy's list prices were the same as Core-Mark's list prices.

72.     In about September 2016, the Holbrook store stopped ordering from Mountain Candy.

73.     Mountain Candy's sales representative visited the store and saw that Mountain Candy's shelf labels had been replaced by Core-Mark shelf labels.  After the Mountain Candy sales representative inquired about the change, he was told by the Holbrook store's operator, that it had switched its business to Core-Mark because Core-Mark was giving a $2 rebate per carton.

74.     With its rebates, Core-Mark sold cigarette cartons to Holbrook for $2 below the statutory minimum price.

75.     Core-Mark beat Mountain Candy's prices by offering Holbrook rebates of $2 per carton.

76.     Because of Core-Mark's cigarette rebates, Holbrook switched all of its business, including its purchases of cigarette purchases and non-cigarette goods, from Mountain Candy to Core-Mark.  Mountain Candy went from annual sales to the Holbrook store of over $100,000 to zero.  In addition, because it would not give the same illegal prices as Core-Mark, Mountain Candy was also shut out from the business of the entire Holbrook collection of stores.

77.     At the time of each of Core-Mark's transactions with Holbrook, no other competitor had offered Holbrook legal prices that were equal to or lower than the prices at which Core-Mark sold cigarettes to Holbrook.

78.     At the time of each of its transactions with Holbrook, Core-Mark did not make good faith efforts to determine whether any of its competitors were offering Holbrook legal prices below the statutory minimum for the same goods, nor did it make good faith efforts to meet, but not beat, such prices.  To the contrary, Core-Mark recognized that other companies' prices were not "legit."

79.     Core-Mark offered its rebates to Holbrook with the intent to harm competitors such as Mountain Candy, and to destroy or substantially lessen competition.

### 3.     Illustrative Example:  Anchor Beverage Center & ASC Mart

80.     In about July 2016, Plaintiff Donohue Candy was the primary cigarette supplier to Anchor Beverage Center in South Glens Falls, New York ("Anchor"), and ASC Mart in Mechanicville, New York ("ASC"), which are commonly owned by Guru NDH Inc.  Donohue Candy also sold non-cigarette goods to Anchor and ASC.

81.     Donohue Candy charged its cigarette list prices to Anchor and ASC, and those list prices were exactly at the minimum price calculated under the CMSA formula.  Donohue Candy's list prices were the same as Core-Mark's list prices.

82.     In about July 2016, Anchor and ASC stopped ordering from Donohue Candy.

83.     Donohue Candy's owner visited Anchor and inquired with a representative of Guru NDH Inc. about the abrupt change.  He was told that Anchor and ASC had switched their business to Core-Mark because Core-Mark was giving at least a $1 rebate per carton.

84.     With its rebates, Core-Mark sold cigarette cartons to Anchor and ASC for at least $1 below the statutory minimum price.

85.     Core-Mark beat Donohue Candy's prices by offering Anchor and ASC rebates of at least $1 per carton.

86.     Because of the cigarette rebates, Anchor and ASC switched all of their business, including cigarette purchases and the purchases of other products, from Donohue Candy to Core-Mark.  Anchor and ASC also failed to pay Donohue Candy for the invoices that were outstanding at the time Core-Mark took the business from Donohue.

87.     At the time of each of Core-Mark's transactions with Anchor and ASC, no other competitor had offered Anchor and ASC legal prices for the same goods that were equal to or lower than the prices at which Core-Mark sold cigarettes to Anchor and ASC.

88.     At the time of each of its transactions with Anchor and ASC, Core-Mark did not make good faith efforts to determine whether any of its competitors were offering Anchor and ASC legal prices below the statutory minimum for the same goods, nor did it make good faith efforts to meet, but not beat, such prices.  To the contrary, Core-Mark recognized that other companies' prices were not "legit."

89.     Core-Mark offered its illegal prices to Anchor and ASC with the intent to harm competitors such as Donohue Candy, and to destroy or substantially lessen competition.

### 4.     Illustrative Example:  Priya & Mohit

90.     Before about August 2016, Plaintiff Mountain Candy was the primary supplier of cigarettes to Priya and Mohit Enterprises, Inc. in Grand Island, New York ("Priya").  About 85 percent of Mountain Candy's sales to Priya were cigarettes, and the remainder was non-cigarette goods.

91.     Mountain Candy charged its cigarette list prices to Priya, and those list prices were exactly at the minimum price calculated under the CMSA formula.  Mountain Candy's list prices were the same as Core-Mark's list prices.

92.     In about August 2016, Priya stopped ordering from Mountain Candy.

93.     Mountain Candy's sales representative inquired about the change and was told by Priya's operator's that Priya had switched its business to Core-Mark because Core-Mark was giving a $1 rebate per carton.

94.     With its rebates, Core-Mark sold cigarette cartons to Priya for $1 below the statutory minimum price.

95.     Core-Mark beat Mountain Candy's prices by offering Priya rebates of $1 per carton.

96.     Because of the cigarette rebates, Priya switched all of its business, including cigarette purchases and the purchases of other products, from Mountain Candy to Core-Mark. Mountain Candy went from making over $260,000 in annual sales to Priya in 2015 to making zero in sales.

97.     At the time of each of Core-Mark's transactions with Priya, no other competitor had offered Priya legal prices that were equal to or lower than the prices at which Core-Mark sold cigarettes to Priya.

98.     At the time of each of its transactions with Priya, Core-Mark did not make good faith efforts to determine whether any of its competitors were offering Priya legal prices below the statutory minimum for the same goods, nor did it make good faith efforts to meet, but not beat, such prices.  To the contrary, Core-Mark recognized that other companies' prices were not "legit."

99.     Core-Mark offered its rebates to Priya with the intent to harm competitors such as Mountain Candy, and to destroy or substantially lessen competition.

**C.     Core-Mark's Illegal Prices Based on Rebates Paid Through Up-Front or Monthly Allowances**

100.    Core-Mark did not sell cigarettes to its New York customers together with other products for a combined selling price.  Rather, as required by New York record-keeping regulations for cigarette sales (*see* 20 N.Y.C.R.R. § 75.5), it recorded its cigarette sales separate from their sales of non-cigarette products.

101.    Core-Mark, at times, gave cigarette rebates hidden in up-front payments, "monthly allowance" checks and other payments it made to its customers that purchased cigarettes from Core-Mark.

102.    Core-Mark has entered into agreements with customers to pay them these hidden rebates that were driven by the customer's cigarette sales.  As stated by Core-Mark's sales manager, "if a store is doing a lot of cigarettes, we can pay."

103.    While Core-Mark sells both cigarette and non-cigarette product most of its New York customers, the profit margins on the non-cigarette products are extremely low and would

22

not justify rebates in the amounts that Core-Mark agreed to pay.  Accordingly, Core-Mark agreed to make the payments only where the customers bought sufficient amounts of cigarettes, and the payments predominantly served to reduce Core-Mark's profit margins and its prices on its cigarette sales to these customers.

### 1.    Illustrative Example:  Smokers Choice

104.    Smokers Choice ("Smokers Choice") is a chain of approximately 55 retail stores that sell cigarettes and is owned and operated by SC Choice Management Corp., located in Rock Hill, New York.  Smokers Choice sold primarily cigarettes. It also sold, to a lesser degree, other tobacco and e-cigarette products.

105.    Plaintiff Mountain Candy helped the founder of the Smokers Choice chain start and grow the business.  Until February 2016, Mountain Candy was the exclusive supplier for this chain, except for a minimal amount of uncommon items, such as glass hookahs.  As Smokers Choice grew and expanded it became Mountain Candy's biggest customer, accounting for a large percentage of Mountain Candy's annual sales.  By 2015, Mountain Candy's sales to Smokers Choice were in the tens of millions of dollars, about 66 percent of which was for sales of cigarettes.  The cigarette sales accounted for about 98 percent of Mountain Candy's profit margins from its sales to Smokers Choice because the profit margins on the non-cigarette items sold were extremely small or non-existent.

106.    Mountain Candy charged its cigarette list prices to Smokers Choice, and those list prices were exactly at the minimum price calculated under the CMSA formula.  Mountain Candy's list prices were the same as Core-Mark's list prices.  Mountain Candy's profit margins on the non-cigarette items purchased by Smokers Choice were similar to Mountain Candy's extremely small profit margins on those items.

107.     In February 2016, Smokers Choice stopped purchasing cigarettes from Mountain Candy because it agreed to give all of its cigarette business to Core-Mark in exchange for an up-front payment of $750,000.

108.     Core-Mark agreed to make the up-front payment Smokers Choice because of the chain's anticipated levels of cigarette purchases, and it calculated the up-front payment based on the cigarette sales it expected to make to Smokers Choice.  The up-front payment was a rebate because it was a payment to the chain that served to reduce the prices it paid for cigarettes from Core-Mark.  Because the list price for the cigarettes was already at the statutory minimum level and Core-Mark's profit margin on the non-cigarette items was nearly non-existent, the payment pushed the prices for Core-Mark's sales below the statutory minimum level.

109.     As a direct result of Core-Mark's rebates to Smokers Choice through its up-front payment, Mountain Candy lost tens of millions of dollars in annual sales.  The loss of this large volume of business forced Mountain Candy to lay off employees, which was exactly the type of New York job losses the Legislature sought to prevent with the passage of the CMSA.

110.     At the time Core-Mark made its arrangement with Smokers Choice, no other competitor had offered Smokers Choice a similar arrangement, nor had any offered Smokers Choice legal prices that were equivalent to or lower than Core-Mark's effective prices for the cigarettes it sold to Smokers Choice.

111.     At the time of Core-Mark's agreement to pay the up-front money and subsequently at the time of each sale to Smokers Choice, Core-Mark did not make good faith efforts to determine whether any of its competitors were offering Smokers Choice any similar arrangement nor whether any of its competitors were offering Smokers Choice legal prices

below the statutory minimum, nor did it make good faith efforts to meet, but not beat, such prices.  To the contrary, Core-Mark recognized that other companies' prices were not "legit."

112.    Core-Mark offered its up-front payment to Smokers Choice with the intent to harm competitors, such as Mountain Candy, and to destroy or substantially lessen competition.

### 2.    Illustrative Example:  B&J Singh Corp. & Related Stores

113.    In the Newburgh, New York area is a network of about 15 related retailers including B&J Singh Corp. (in Newburgh), B+J Singh Corp (in Newburgh), BRK Singh 94 & 9W, Inc., (in New Windsor), BRV Singh, Inc. (in Newburgh), Singh Petro Corp. (in Newburgh), and LJR Singh Corp. (in Newburgh).  These stores are referred to collectively here as the "Singh" stores.

114.    Before about October 2011, Plaintiff Mountain Candy was the exclusive supplier to the Singh stores, and then for a period during 2014 and 2015, it was a "fill in" supplier to B&J Singh Corp.

115.    Since before 2015, the Singh stores purchased cigarettes from Core-Mark because Core-Mark paid each one monthly checks.  In about 2017, the amounts of the monthly payments to each store varied between $600 and $800.  Core-Mark's cigarette list prices to the Singh stores were the minimum prices calculated under the CMSA formula, and its margins for non-cigarette products were extremely low.

116.    Core-Mark agreed to make the monthly payments to the Singh stores because of the stores' anticipated levels of cigarette purchases, and it calculated the monthly payment based on those levels.  The monthly payments were rebates because they were payments to the stores that served to reduce the stores' effective prices for cigarettes from Core-Mark.  Because the list prices for the cigarettes were already at the statutory minimum levels and Core-Mark's profit

margins for the non-cigarette items was extremely low, these payments pushed the prices for Core-Mark's sales below the statutory minimum level.

117.    Over the years, and as recently as 2017, Mountain Candy solicited business from the Singh stores collectively to sell cigarettes and other products.  It offered to sell cigarettes to the stores at its list prices, which were exactly at the statutory minimum level.

118.    The operator of the Singh stores responded to Mountain Candy's solicitations by telling Mountain Candy that he wanted the services that Mountain Candy offered, but could not move its business because of Core-Mark's monthly payments.

119.    The primary operator of the Singh stores consistently, including recently, praised Mountain Candy for its level of service and its knowledge of the industry, and he told Mountain Candy that he would have the Singh stores purchase from Mountain Candy, including as their primary cigarette supplier, if only Mountain Candy would offer rebates on cigarettes, even rebates in amounts less than Core-Mark offered.  Mountain Candy, however, refused to offer illegal prices and, as a result, did not regain the business.

120.    Because of the cigarette rebates, Singh refused to switch its cigarette business and the purchases of other products from Core-Mark to Mountain Candy.

121.    As a direct result of Core-Mark's rebates to the Singh stores through its monthly payments, Mountain Candy lost the sales it would have made to the Singh stores absent Core-Mark's illegal cigarette prices.

122.    At the times Mountain Candy solicited business from the Singh stores and at the time that Core-Mark made and renewed its arrangements with the stores, no other competitor had offered the stores similar arrangements nor had any offered the Singh stores legal prices that

were equivalent to or lower than Core-Mark's effective prices for the cigarettes it sold to the stores.

123.    At the times of Core-Mark's agreements to make the monthly payments and subsequently at the time of each sale to the Singh stores, Core-Mark did not make good faith efforts to determine whether any of its competitors were offering the Singh stores any similar arrangements nor whether any of its competitors were offering the stores legal prices below the statutory minimum, nor did it make good faith efforts to meet, but not beat, such prices.  To the contrary, Core-Mark recognized that other companies' prices were not "legit."

124.    Core-Mark offered its monthly payments to the Singh stores with the intent to harm competitors, such as Mountain Candy, and to destroy or substantially lessen competition.

### 3.    Illustrative Example:  A&S Food Mart Inc. & Related Stores

125.    In or near Kerhonkson, New York is a set of commonly-owned retail stores including A&S Food Mart Inc. (in Ellenville), A&S Food Mart Inc. (in Kerhonkson), Ali Petro Line Inc. (in Kerhonkson), Ayaaz Petroleum Inc. (in Saugerties), Yazi Petroleum Inc. (in Ulster Park), and Yazi Petro-Line Inc. (in Kerhonkson).  These stores are collectively referred to here as "A&S."

126.    In 2016 and 2017, depending on the individual store, Plaintiff Mountain Candy was a supplier to the A&S stores for "fill-in" orders.  About 72% percent of Mountain Candy's sales to the A&S stores were cigarettes and the remainder was non-cigarette goods.

127.    Mountain Candy charged its cigarette list prices to the A&S stores, and those list prices were exactly at the minimum price calculated under the CMSA formula.  Mountain Candy's cigarette list prices were the same as Core-Mark's list prices, and Core-Mark's profit margins for the non-cigarette items were similar to Mountain Candy's.

128.    Between late 2016 and July 2017, depending on the individual store, the A&S stores ceased cigarette and other purchases from Mountain Candy, because they each agreed to give business to Core-Mark in exchange for monthly checks of $500.  The operator of the A&S stores told Mountain Candy that the stores would switch to Mountain Candy as their primary supplier if Mountain Candy provided rebates like Core-Mark.  Mountain Candy would not, however, offer those illegal prices.

129.    Core-Mark agreed to make the monthly payments to the A&S stores because of the stores' anticipated levels of cigarette purchases, and it calculated the monthly payment based on those levels.  The monthly payments were rebates because they were payments to the stores that served to reduce the stores' effective prices for cigarettes from Core-Mark.  Because the list prices for the cigarettes were already at the statutory minimum levels and Core-Mark's profit margins on the non-cigarette items was extremely low, these payments pushed the prices for Core-Mark's sales below the statutory minimum level.

130.    As a direct result of Core-Mark's rebates to the A&S stores through its monthly payments, Mountain Candy lost the sales it would have made to the A&S stores absent Core-Mark's illegal cigarette prices.

131.    At the times Core-Mark made its arrangements with the A&S stores, no other competitor had offered the A&S stores similar arrangements nor had any offered the stores legal prices that were equivalent to or lower than Core-Mark's effective prices for the cigarettes it sold to the A&S stores.

132.    At the times of its agreements to make the monthly payments and subsequently at the time of each sale to the A&S stores, Core-Mark did not make good faith efforts to determine whether any of its competitors were offering the A&S stores any similar arrangements nor

28

whether any of its competitors were offering the stores legal prices below the statutory minimum, nor did it make good faith efforts to meet, but not beat, such prices.  To the contrary, Core-Mark recognized that other companies' prices were not "legit."

133.    Core-Mark offered its monthly payments to the A&S stores with the intent to harm competitors, such as Mountain Candy, and to destroy or substantially lessen competition.

### 4.    Illustrative Example:  Jay's One Stop

134.    Until about May 2017, Plaintiff Mountain Candy was the primary cigarette supplier to two Jay's One Stop retail stores in Johnson City, New York ("Jay's One Stop"). About 85% percent of Mountain Candy's sales to the Jay's One Stop stores were cigarettes and the remainder was non-cigarette goods.

135.    Mountain Candy charged its cigarette list prices to the Jay's One Stop stores, and those list prices were exactly at the minimum price calculated under the CMSA formula. Mountain Candy's cigarette list prices were the same as Core-Mark's list prices, and its profit margins on non-cigarette items were similar to Core-Mark's.

136.    In about April and May 2017, the Jay's One Stop stores sharply reduced their cigarette and other purchases from Mountain Candy, because they had agreed to give some of their business to Core-Mark in exchange for monthly checks to each store of $600.

137.    Core-Mark agreed to make the monthly payments to the Jay's One Stop stores because of the stores' anticipated levels of cigarette purchases, and it calculated the monthly payment based on those levels.  The monthly payments were rebates because they were payments to the stores that served to reduce the stores' effective prices for cigarettes from Core-Mark.  Because the list prices for the cigarettes were already at the statutory minimum levels and Core-Mark's profit margins on the non-cigarette items were extremely low, these payments pushed the prices for Core-Mark's sales below the statutory minimum level.

138.    As a direct result of Core-Mark's rebates to the Jay's One Stop stores through its monthly payments, Mountain Candy lost the sales it would have made to the Jay's One Stop stores absent Core-Mark's illegal cigarette prices.

139.    At the times Core-Mark made its arrangements with the Jay's One Stop stores, no other competitor had offered the stores similar arrangements, nor had any offered the Jay's One Stop stores legal prices that were equivalent to or lower than Core-Mark's effective prices for the cigarettes it sold to the stores.

140.    Moreover, at the times of its agreements to make the monthly payments and subsequently at the time of each sale to the Jay's One Stop stores, Core-Mark did not make good faith efforts to determine whether any of its competitors were offering the Jay's One Stop stores any similar arrangements nor whether any of its competitors were offering the stores legal prices below the statutory minimum, nor did it make good faith efforts to meet, but not beat, such prices.  To the contrary, Core-Mark recognized that other companies' prices were not "legit."

141.    Core-Mark offered its monthly payments to the Jay's One Stop stores with the intent to harm competitors, such as Mountain Candy, and to destroy or substantially lessen competition.

### 5.    Illustrative Example:  Mahima Corporation

142.    For a time prior to 2015, Plaintiff Mountain Candy was a supplier of cigarettes to Mahima Corporation ("Mahima") in Ellenville, New York.  About 90% percent of Mountain Candy's sales to Mahima were cigarettes, and the remainder was non-cigarette goods.

143.     Since at least 2015, Mahima purchased cigarettes from Core-Mark because Core-Mark paid it monthly checks of $500.  Core-Mark's cigarette list prices to Mahima are the minimum prices calculated under the CMSA formula, and its profit margins on non-cigarette items it sold to Mahima are extremely low.

144.    Core-Mark agreed to make the monthly payments to Mahima because of the store's anticipated levels of cigarette purchases, and Core-Mark calculated the monthly payment based on those levels.  The monthly payments were rebates because they were payments to Mahima that served to reduce the store's effective prices for cigarettes from Core-Mark. Because the list prices for the cigarettes were already at the statutory minimum levels and Core-Mark's profit margins on the non-cigarette items were extremely low, these payments pushed the prices for Core-Mark's sales below the statutory minimum level.

145.    Within the last eighteen months, Mountain Candy solicited business from Mahima for the sale of cigarettes and other products.  It offered to sell cigarettes to Mahima at its list prices.

146.    The operator of Mahima responded to Mountain Candy's solicitations by telling Mountain Candy that Mountain Candy's and Core-Mark's list prices are essentially the same, and that he wanted the services that Mountain Candy offered, but Mahima would not move its business because of the $500 monthly checks Core-Mark was paying.

147.    Because of Core-Mark's illegal cigarette pricing, Mahima would not switch its cigarette business and the purchases of other products from Core-Mark to Mountain Candy, and Mountain Candy lost the sales it would have made to Mahima absent Core-Mark's illegal prices.

148.    At the time Mountain Candy solicited business from Mahima and at the times that Core-Mark made and renewed its arrangement with Mahima, no other competitor had offered Mahima similar arrangements nor had any offered Mahima legal prices that were equivalent to or lower than Core-Mark's effective prices for the cigarettes it sold to Mahima.

149.    At the time of Core-Mark's agreement to make the monthly payments to Mahima and subsequently at the time of each sale to Mahima, Core-Mark did not make good faith efforts

to determine whether any of its competitors were offering Mahima any similar arrangement nor whether any of its competitors were offering Mahima legal prices below the statutory minimum, nor did it make good faith efforts to meet, but not beat, such prices. To the contrary, Core-Mark recognized that other companies' prices were not "legit."

150. Core-Mark offered its monthly payment to Mahima with the intent to harm competitors, such as Mountain Candy, and to destroy or substantially lessen competition.

**D. Core-Mark Intentionally Injured Plaintiffs and Destroyed or Substantially Lessened Competition**

151. Core-Mark has repeatedly and intentionally injured Plaintiffs in precisely the way the CMSA was designed to avoid. Core-Mark offered illegal prices through its rebates knowing that it left distributors like Plaintiffs, who followed the law, at a severe disadvantage. As Core-Mark intended, Plaintiffs were injured by the loss or reduction of cigarette business to established and prospective customers that Core-Mark lured away as a result of Core-Mark's illegal cigarette pricing. Plaintiffs were further injured, as Core-Mark intended, by the loss or reduction of sales of non-cigarette business to those customers. They were still further injured, as Core-Mark intended, by the diminution in the value of their business that resulted from the reduction in their sales as a result of Core-Mark's illegal cigarette pricing.

152. Plaintiff Amsterdam Tobacco has been so badly harmed by Core-Mark's illegal rebating practices that it has given up its agent license and thus its business as a stamping agent.

153. Core-Mark also intended to and did destroy or substantially lessen competition in the market for the wholesale sale of cigarettes in New York by driving other competitors out of business with its illegal pricing. The number of cigarette licensed agents and wholesalers in New York has declined dramatically while business has become increasingly consolidated with a

32

small number of wholesalers, most of which are based out of state, including Core-Mark, that have priced their cigarettes illegally in New York in violation of the CMSA.

## COUNT I

### Violations of New York Cigarette Marketing Standards Act
### N.Y. Tax Law § 484

154.    Plaintiffs reassert and incorporate by reference all paragraphs set forth above as if restated herein.

155.    Defendant Core-Mark has violated N.Y. Tax Law § 484 by offering to sell and selling cigarettes at less than the minimum prices set by the CMSA, and doing so with the intent to injure competitors or to destroy or substantially lessen competition.  Throughout the time period relevant herein, Core-Mark has offered and given customers rebates on cigarettes that drove the prices for such cigarettes below the applicable minimum prices for the cigarettes, and it did so with the intention of taking customers away from competitors, including Plaintiffs, and keeping them, thereby injuring Plaintiffs and destroying or substantially lessening competition.

156.    As a result of Defendant's violations, Plaintiffs have been injured in amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Amsterdam Tobacco, Donohue Candy and Mountain Candy pray that judgment be entered against Defendant Core-Mark for violations of the New York Cigarette Marketing Standards Act as follows:

(a)    Enjoining and restraining Defendant Core-Mark from engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

(b)    Directing that Defendant Core-Mark, pursuant to the New York Cigarette Marketing Standards Act, pay damages to Plaintiffs;

(c)    Directing that Defendant Core-Mark pay Plaintiffs' fees and costs, including attorneys' fees as provided by law;

(d)    Directing such other equitable relief as may be necessary to redress Defendant's violations of New York law; and

(e)    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial.

Dated:  New York, New York
        July 2, 2018

                              Respectfully Submitted,


                              _____/s/ Randall M. Fox_____
                              Randall M. Fox
                              Anthony E. Maneiro
                              KIRBY MCINERNEY LLP
                              825 Third Avenue, 16th Floor
                              New York, N.Y.  10022
                              Tel: (212) 371-6600
                              Fax: (212) 751-2540
                              rfox@kmllp.com
                              amaneiro@kmllp.com

                              *Counsel for Plaintiffs*